# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **TRINELL KING,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION NO.** |
| | ] | **2:17-CV-174-KOB** |
| **COREY ARCHER, *et al.*,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## <u>MEMORANDUM OPINION</u>

In this § 1983 case, the police used Plaintiff Trinell King as unwilling bait in an impulsive fishing expedition that, unsurprisingly, went awry. Mr. King claims that Defendants Corey Archer, Ricky Pridmore, and Andrew Hill, all officers with the City of Warrior police department, violated the Fourteenth Amendment's guarantee of substantive due process by acting with deliberate indifference to his health and safety. Mr. King also brings state-law claims of negligence, wantonness, and false imprisonment. The case is now before the court on the Officers' motions for summary judgment as to all claims. (Docs. 63, 67).[1] Also before the court is the Officers' "Motion to Strike." (Doc. 85).

The court will DENY the Officers' motion to strike. (Doc. 85). The court will GRANT the Officers' motions for summary judgment. (Docs. 63, 67).

In short, Mr. King asserts that the Officers threatened to injure him or prosecute him on false charges unless he agreed to help them in their half-baked sting operation. Mr. King, who received several gunshot wounds as a reward for acting as the Officers' lure in the botched sting, explains that he only agreed to help the Officers because of these threats.

---

[1] Each Defendant adopts the others' arguments in their motions for summary judgments; so, in effect, their motions are one in the same.

Mr. King argues that, because, by threatening him, the Officers deprived him of his ability to choose whether he participated in the dangerous sting, the Officers are liable under the Fourteenth Amendment for their deliberate indifference to the safety risks posed to him by the operation. On similar grounds, Mr. King claims that the Officers acted with negligence and wantonness and that their acts resulted in his false imprisonment. The Officers raise qualified immunity as to the § 1983 claim and state-agent immunity as to the state-law claims.

Only for the purpose of deciding the Officers' entitlement to qualified immunity, the court assumes that Mr. King has shown that the Officers acted to deprive him of his Fourteenth Amendment right to substantive due process. But to overcome the qualified immunity defense, Mr. King must also show that the right violated by the Officers was clearly established, which, in this case, requires Mr. King to establish that a reasonable officer would have *known* the Officers' acts rendered Mr. King's consent to participate in the sting operation involuntary. Here, although the Officers' acts may have left *Mr. King* with the belief that he had no choice but to participate in the sting, the same acts would not have been plainly or obviously coercive to a *reasonable officer*. Hence, the constitutional violation asserted by Mr. King is not clearly established.

The Officers are entitled to qualified immunity as to Mr. King's Fourteenth Amendment substantive due process claim and state-agent immunity as to Mr. King's state-law claims. The court will GRANT the Officers' motions for summary judgment. (Docs. 63, 67). The court explains its decisions in further detail below.

## STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present

and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-23.

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986); *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  And the court must view all evidence and inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

# FACTS

Plaintiff Trinell King enjoyed the morning of September 28, 2015, cruising Highway 31 near Warrior, Alabama, in his girlfriend's bright red Chevy Monte Carlo. His passenger, Donovan Brown, a convicted felon, carried a pistol and apparently few qualms about using it.[2]

The car Mr. King drove had no license plate. And at around 9:45 AM on that early-fall Monday, Defendant Ricky Pridmore, an officer with the City of Warrior police department, saw Mr. King and the Monte Carlo, noticed that it lacked a license plate, and consequently conducted a traffic stop. During the stop, Officer Pridmore discovered that Mr. King also did not have a driver's license. And, worse, Mr. King was serving a criminal sentence, having been released on probation. Mr. King's choices to drive a car without a license plate, drive a car without a valid driver's license, and associate with a convicted felon would have been sufficient under Alabama law to revoke his probation.

When Officer Pridmore returned to his patrol car to attempt to verify Mr. King's and Mr. Brown's identities, Mr. Brown told Mr. King that he was carrying a gun, that he had outstanding warrants for his arrest, and that he wanted to flee. Almost as soon as he said those words, Mr. Brown bailed out of the car and fled into the woods alongside the highway.

When Mr. Brown fled, Officer Pridmore quickly detained Mr. King and secured him inside the patrol car. Defendant Corey Archer, a lieutenant with the City of Warrior police department, arrived on the scene minutes later. Defendant Andrew Hill, a detective, also arrived at the scene. The three officers—assisted by Officer Pridmore's K-9—then began searching for Mr. Brown in the nearby wooded area.

---

[2] In his deposition Mr. Brown testified that he "had" to shoot at the police officers who attempted to arrest him because he felt that Mr. King "sold [him] out" to the police. (Doc. 65-9 at 11).

Mr. King remained detained in Officer Pridmore's patrol vehicle for the duration of the search, which lasted until around 11:00 AM.  During that time, Mr. King freely offered assistance to the Officers, telling them what he knew about Mr. Brown—including that Mr. Brown had a gun—and showing the police where he picked up Mr. Brown.  The Officers' search, however, was unsuccessful.

The Officers called a tow truck to remove the Monte Carlo from the scene; they intended to write Mr. King a ticket and then grab lunch.  Yet, before towing the vehicle, the Officers devised a plan to catch Mr. Brown.  Their plan required Mr. King's assistance.

As Mr. King relates the events, the Officers surrounded Mr. King—who remained handcuffed in the back of the patrol car—and told him that, if he refused to play the role of bait, they would tow his girlfriend's car and bring "serious" charges against him.  And, the Officers summarily informed Mr. King that if he "fuck[ed] over" the police, they would "fuck [him] over" as well.  (Doc. 81 at 17).

In his deposition, Mr. King testified that he perceived this latter statement as a threat to physically injure him because "in the streets" such statement could mean "anything," including physical violence.  (Doc. 65-3 at 53).  In an affidavit submitted after his deposition,[3] Mr. King averred that his belief that the Officers would physically injure him as reprisal for refusing to cooperate was the main factor motivating him to help in the sting operation.

At some point during the exchange, Mr. Brown called Mr. King's cell phone.  At the Officers' direction, Mr. King answered the call, said that he had been released, and asked Mr. Brown about his current location.  Mr. Brown told Mr. King that he was in the woods nearby.  At the Officers' direction, Mr. King offered to pick up Mr. Brown.

---

[3] The Officers have asked the court to strike Mr. King's affidavit, which Mr. King only provided after the Officers filed the motions for summary judgment currently before the court. The court denies that request as discussed in further detail below.

Lieutenant Archer and Detective Hill planned to use Mr. King to capture Mr. Brown. They told Mr. King to pick up Mr. Brown in the Monte Carlo and drive onto the nearby interstate highway. And they told Mr. King that they and other officers—five or six in total—would be following close behind. Lieutenant Archer and Detective Hill planned to stop the vehicle on the interstate, ideally in an area with a wall to prevent a second escape by Mr. Brown. The Officers told Mr. King to tell Mr. Brown to throw away his gun before allowing him into the car.

Mr. King agreed to participate, but he maintains that he only did so because the Officers threatened to hurt him or prosecute him on false charges if he refused. The Officers removed Mr. King's handcuffs and lowered the Monte Carlo from the tow truck and returned its keys to him. Mr. King drove away as directed and picked up Mr. Brown.

But, the ruse did not fool Mr. Brown. Mr. King tried to confirm that Mr. Brown did not have his gun, but Mr. Brown, perhaps contemplating revenge, lied and told him that he had left it in the woods. Mr. King then drove toward the interstate highway as directed. But Mr. King or Mr. Brown saw the officers behind them before they drove onto the highway; worse, the officers attempted to conduct the traffic stop too soon. Mr. King then stopped or attempted to stop the car and told Mr. Brown to get out of the car.

Mr. Brown refused, choosing instead to open fire on the police; the Officers responded likewise. Mr. Brown testified in his deposition that he shot at the police in part because he wanted to get revenge on Mr. King for helping the police catch him.

As Mr. Brown intended, Mr. King found himself caught in the crossfire; he was shot five times. The police shot Mr. Brown 13 times, and Mr. Brown shot Officer Pridmore once. Miraculously, all parties survived—albeit with serious injuries. Mr. King subsequently filed the instant lawsuit.

## MOTION TO STRIKE

The court first addresses the Officers' motion to strike. The Officers ask that the court exclude three of Mr. King's submissions of evidence: (1) an audio recording of an investigator's interview with Mr. King during his post-shooting hospitalization; (2) a compilation of summaries prepared of that interview by investigators; and (3) Mr. King's post-deposition affidavit (doc. 80-1).

The court will DENY the Officers' motion as to the audio recording of Mr. King's interview and the compilation of summaries prepared of the interview. The court agrees, however, that—considered or not—neither piece of evidence "affect[s] the outcome of this case under the governing substantive law." (Doc. 85 at 5). In light of that conclusion, the court sees no reason to consider the issue further.

Conversely, the court's potential rejection of Mr. King's post-deposition affidavit *could* alter the outcome of the Officers' summary judgment motions. In his post-deposition affidavit, Mr. King avers (1) that no one asked him at his deposition whether the Officers threatened to physically harm him if he failed to cooperate, and (2) that the Officers, in fact, threatened to physically harm him if he failed to cooperate.

The Officers move to strike Mr. King's post-deposition affidavit on the ground that, at his deposition and despite being asked whether he had omitted any critical facts relevant to why he participated in the sting operation, Mr. King failed to mention that the Officers threatened to physically harm him if he did not cooperate in their sting operation. Although the Officers do not argue that Mr. King *directly* contradicts his deposition testimony in his affidavit, they contend that his omission of these critical facts amounts to acknowledging that the Officers *did not* threaten to physically injure him.

The motion to strike relies on the principle that a court should disregard as a "sham" the content of a post-deposition affidavit to the extent it directly contradicts earlier deposition testimony without explanation.  *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  And a thin line exists between discrepancies that create "sham" affidavits and discrepancies that create credibility issues.  While the court may disregard an affidavit in the former case, a jury must resolve the latter.  *Id.* at 953-54.

The court finds that Mr. King did not testify inconsistently in his deposition and in his affidavit.  Mr. King testified that he *perceived* certain remarks made by the Officers as *implied* threats to physically harm him.  For example, in his deposition, Mr. King said—somewhat unclearly—that he interpreted the Officers' statement that "we're going to make sure we f--- over you, if you f--- over us" as an *implied* threat of physical violence as reprisal for refusing to cooperate in the sting operation.  And, in his deposition, Mr. King made known his belief that "in the streets" the Officers' remarks "could mean anything," including physical violence.  (Doc. 65-3 at 53).

The court sees Mr. King's post-deposition affidavit as a clarification of that testimony.  Indeed, in his affidavit, Mr. King states—just as he did in his deposition—that he *felt* threatened and that he *feared* physical reprisal if he refused to participate in the sting operation.  Likewise, in his response to the Officers' motion to strike, Mr. King acknowledges that his affidavit simply "articulat[ed] what he thought and felt, not what someone else thought and felt."  (Doc. 92 at 5).  Accordingly, the court will not strike Mr. King's affidavit as a sham.  *See Tippens*, 805 F.2d at 953.

Yet the court also finds that, by failing to identify any *specific* and *express* threat in response to the Officers' counsel's request at the deposition to identify significant information

relevant to his claims that he had not yet testified about, Mr. King implicitly acknowledged that the Officers *did not* make any *specific* and *express* threat to injure him. The Officers' counsel asked Mr. King if he had failed to mention any other significant facts, and an express statement from the Officers such as, "We will hit you if you refuse to help us," is nothing if not significant. (Doc. 65-3 at 39). Mr. King thus had sufficient opportunity at his deposition to identify any *express* threats of physical harm; further, the broad questions counsel asked of him required him to identify any such threats. Likewise, in his affidavit, Mr. King does not identify what, if anything, the Officers said that he might have interpreted as an *express* threat. Instead, he only generally states that the Officers threatened him.

In sum, the court will not strike Mr. King's affidavit as requested by the Officers, but the court also cannot reasonably infer from Mr. King's testimony or affidavit that the Officers made an express threat to harm him. The court will DENY the motion to strike.

## DISCUSSION

The court turns next to the substance of Mr. King's claims. Mr. King argues that the Officers violated the Fourteenth Amendment's guarantee of substantive due process by forcing him to assist in Mr. Brown's capture. He also contends, under Alabama law, that the Officers acted negligently and wantonly in planning the sting operation and that the Officers falsely imprisoned him. The court addresses Mr. King's § 1983 claim first and then his state-law claims. Ultimately, Mr. King fails to overcome the significant barriers of qualified immunity and state-agent immunity. The court, therefore, will grant the Officers' motions for summary judgment in all respects.

*I.    Fourteenth Amendment Substantive Due Process Claim (Count 1)*

Through § 1983, Mr. King asserts that the Defendant Officers violated his Fourteenth Amendment right to due process by forcing him to participate in the capture of a dangerous fugitive.  The Officers assert qualified immunity.

The applicability of qualified immunity presents a question of law for the court.  *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).  To be eligible for qualified immunity, a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred.  *Id.* at 1194.  The burden then shifts to the plaintiff to show that qualified immunity is inappropriate.  *Id.*  The claim of qualified immunity then fails only if the plaintiff has shown the deprivation of a clearly-established constitutional right.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts may conduct *Saucier*'s analysis in any order).

The parties do not contest that, in interrogating Mr. King and conducting the sting operation, the Officers acted within their discretionary authority.  In consequence, the court must only determine whether the Officers violated a clearly-established constitutional right.

Mr. King claims that the Officers deprived him of his Fourteenth Amendment substantive due process rights first by "forcing him to participate in [the Officers'] dangerous sting operation by threatening to hurt him and (to a lesser extent) bring false charges against him," and second by "failing to protect him from the real threat of being shot by [Mr.] Brown during the sting." (Doc. 81 at 36).  He points specifically to the Officers' threats that they would bring "serious" charges against him as evidence that the Officers intended to prosecute him on false charges and he points to the Officers' statement that they would "f--- [him] over" as evidence that the Officers intended to injure him.

From those remarks, Mr. King concludes that, under the circumstances, he did not face the permissible choice of jail or participation in the sting, but the impermissible choice of participation in the sting or violent retaliation from the police. The court will assume, for the purpose of this Opinion, that these assertions suffice to show a constitutional violation under the Fourteenth Amendment under the circumstances. Nevertheless, the asserted constitutional violation—that the Officers forced Mr. King to participate in a dangerous sting operation with deliberate indifference to his health and safety in violation of the Fourteenth Amendment—is not clearly established.

Mr. King confronts a mighty obstacle in setting out a *clearly established* constitutional violation. "For the law to be clearly established to the point that qualified immunity does not protect a government official, 'pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.'" *See Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000). A government official is entitled to qualified immunity unless *only* a plainly incompetent official or one who was knowingly violating the law would have committed the acts alleged to have violated the Constitution. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As noted above, Mr. King argues that the Officers violated a clearly-established constitutional rule derived from the Fourteenth Amendment. The Fourteenth Amendment's due process clause protects individuals from arbitrary and conscience-shocking abuses of power by government officials that deprive them of life, liberty, or property; this right is known as "substantive due process." *See* U.S. Const, Amend. XIV; *see, e.g.*, *Waddell v. Hendry Cnty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003). But, in this case, the parties do not

dispute that Mr. Brown, not the Officers, directly created and caused the harms that befell Mr. King. And, under the Fourteenth Amendment, a government official generally does not carry a duty to shield people from harms created and caused by third parties. *See White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999).

But when a government official possesses a custodial power over a person and displaces that person's ability to protect himself, the official's deliberate indifference to that person's safety from predictable third-party harms may "shock the conscience" and violate the Fourteenth Amendment. *See Vaughn v. Athens*, 176 Fed Appx. 974, 977 (11th Cir. 2006) (concluding that plaintiff who State released from jail on personal recognizance in exchange for work as confidential informant was not under the government's "custodial power" and, therefore, defendant state agents had no automatic duty under the Fourteenth Amendment to protect plaintiff from third-party harms suffered in the course of plaintiff's work as confidential informant). As the Eleventh Circuit has stated: "the only relationships that automatically give rise to a governmental duty to protect individuals from harm by third parties under the substantive due process clause are custodial relationships, such as those which arise from the incarceration of prisoners or other forms of involuntary confinement through which the government deprives individuals of their liberty and thus of their ability to take care of themselves." *White*, 183 F.3d at 1257; *see also County of Sacramento v. Lewis*, 523 U.S. 833, 850-52 (1998).

Furthermore, courts have observed that "deliberate indifference" is only the *minimal* intent necessary to establish a Fourteenth Amendment violation. *Waddell*, 329 F.3d at 1306. The Supreme Court has suggested that the requisite intent may be higher depending on the

circumstances, which include the state actor's ability to deliberate about whether action or inaction might protect a person from third-party harms. *Lewis*, 523 U.S. at 850-52.

At the time of the sting that resulted in his injuries, Mr. King was not confined or otherwise incarcerated in the traditional sense. But the state cannot evade liability for a shark attack when it forced the victim to play the role of bait—a role that carries predictable and inherent risks of harm. *Cf. Vaughn*, 176 Fed. Appx. at 977 (affirming dismissal of Fourteenth Amendment deliberate-indifference claim based on qualified immunity because plaintiff was not in custody and "the complaint does not allege that [the plaintiff] was forced to function as an informant."). In that situation, government officials invite liability under the Fourteenth Amendment for their deliberate indifference to the victim's safety because, by their actions, they remove the victim's ability to choose whether he faces those inherent risks. The victim survives or avoids harm at the state's discretion, not his own. *See DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 199-200 (1998) ("The affirmative duty to protect arises . . . from the limitation [that the state] has imposed on [the victim's] freedom to act on his own behalf."); *see also K.H. v. Morgan*, 914 F.2d 846, 848-49 (7th Cir. 1990) (Posner, J.) ("[T]he state would be a doer of harm . . . just as the Roman state was a doer of harm when it threw Christians to the lions."). Therefore, if the Officers deprived Mr. King of his ability to choose whether he participated in the sting, the law burdened the Officers with an affirmative duty to protect Mr. King from Mr. Brown's violent acts.

So, in this case, the critical question is whether Mr. King voluntarily consented to act as bait, or whether the Officers forced him on the hook, making them responsible for the harms Mr. King suffered during their fishing expedition. And, to show that a constitutional violation

premised on a lack of voluntary consent[4] was "clearly established," a plaintiff must identify case law "holding that a similar statement in similar circumstances was sufficiently coercive to render an otherwise-voluntary consent involuntary." *See Hudson*, 231 F.3d at 1297 (addressing under § 1983 and Fourth Amendment whether clearly established violation existed when defendant police officer, after making coercive remark, searched plaintiff without his consent).

Here, the acts that Mr. King asserts resulted in his consent becoming involuntary were, first, the Officers' remarks to him that they would bring "serious" charges against him and, second, the Officers' remarks to him that they would "f--- [him] over." Mr. King points to no cases with similar statements and similar circumstances that would have put the Officers on notice that their remarks were improperly coercive. The court has likewise found no sufficiently similar cases.

Instead, Mr. King argues that the Officers' conduct was so egregious that any reasonable officer would know that this conduct violated Mr. King's constitutional rights. When the coercive nature of a police officer's statements or actions is at issue and no on-point cases otherwise establish their coercive nature, the impropriety of the statements or actions must be "plain" or "obvious" to any reasonable officer under the circumstances. *See Hudson*, 231 F.3d at 1297-98 ("[B]ecause the impropriety of Officer Hall's statement was not obvious and because no materially similar, pre-existing case law was around, a reasonable police officer in the circumstances might not have known that Meadows' consent was involuntary."); *see also Crocker v. Beatty*, 886 F.3d 1132, 1136 (11th Cir. 2018) (observing that a constitutional rule or

---

[4] As noted above, the court assumes that Mr. King established that he did not voluntarily consent to participate in the sting. To find that an individual voluntarily consented, the court would consider the totality of the circumstances and conclude that the individual's decision was "the product of an essentially free and unconstrained choice." *Hudson*, 231 F.3d at 1296 (quoting *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989)).

principle can be clearly established if "every objectively reasonable government official facing the same circumstances would know that his conduct violated federal law at the time he acted.").

But Mr. King overstates the obviousness of the improperly coercive nature of the Officers' remarks in this case. Considering their context and the circumstances, they were not "plainly" or "obviously" improper; even if Mr. King could reasonably interpret the remarks as threats, a reasonable officer would not *know* that these remarks rendered Mr. King's agreement to participate in the sting operation involuntary.

First, Mr. King infers too much from the Officers' use of the word "serious"; on the basis of that word alone, Mr. King concludes that the Officers would plant evidence on him or otherwise prosecute him for crimes he did not commit. Yet Mr. King does not dispute that the Officers made these statements in the context of their threats to revoke his probation and to impound his girlfriend's car. Revocation of probation alone can cause serious consequences.

Nor does Mr. King dispute that the Officers could entice him to cooperate with these prosecutorial *concessions*. And, although the court has found no on-point rule from the Eleventh Circuit, persuasive authority outside the Eleventh Circuit confirms the generally accepted truth that police officers can entice cooperation—even for cooperation in very dangerous stings— through these types of concessions, at least to a degree. *See Alexander v. DeAngelo*, 329 F.3d 912, 918 (7th Cir. 2003) (Posner, J.) ("[C]onfidential informants often agree to engage in risky undercover work in exchange for leniency . . . . The rub here is that [plaintiff] . . . was intentionally and grossly deceived [about the seriousness of potential charges if she failed to cooperate] . . . . [But] we cannot say that it would have been obvious to the average officer that the deceit employed in this case rose to the level of a constitutional violation.").

And here, even though Mr. King maintains that he did not consider charges that resulted

in revocation of his probation to be "serious," most other people, including a reasonable officer, would indeed. Adding to the ire of the court, Mr. King presumably would face the ire of his girlfriend, if her car were impounded—serious indeed. For those reasons, the court cannot say that the Officers' threat to bring "serious" charges against Mr. King would have been plainly or obviously coercive to a reasonable officer.

Second, considered with context, the parallel structure of the Officers' statement that they would "f--- over" Mr. King if he "f---[ed] over" the police, might suggest, at bottom, that, if Mr. King refused to help the police, they would refuse to help him. That is, if Mr. King would not help, the Officers would not ignore that Mr. King had violated his probation or that he was driving a car without a driver's license. So, even if Mr. King's interpretation of the Officers' remark is reasonable from his point of view, a reasonable officer could nevertheless see it as innocuous enticement. The statement's ambiguity means that it was neither plainly nor obviously coercive. *See Hudson*, 231 F.3d at 1297-98.

Indeed, Mr. King himself testified that the Officers' statement could have meant "anything," including—but not necessarily—violence. The court agrees: curse-based exclamations derive much, if not all, their meaning from the context and the non-verbal acts that surround them. So, with the right context, the Officers' same remarks could have been plainly improper to a reasonable officer. But here, Mr. King identifies not one non-verbal act by the Officers or other circumstance that would indicate their remarks plainly suggested violence. For example, although Mr. King testified that the officers surrounded him while he was handcuffed, he did not testify that the officers had pulled their guns or other weapons at that point in the encounter or otherwise physically intimidated or threatened him. Taking these circumstances into account, the court cannot *conclude* that the Officers' statements would be plainly or

obviously coercive to a reasonable officer.

Lastly, Mr. King urges the court to consider whether the constitutional violation was clearly established through the wide lens of whether he was "in custody" at the time of the shooting. He opines that, because he was "in custody"—*i.e.*, he was not free to leave—at the time of the shooting, the Officers violated a clearly established constitutional right.

True enough, a government official cannot act with deliberate indifference toward the health and safety of an individual over whom he has restrained liberty. *See DeShaney*, 489 U.S. at 199-200. But that general rule alone lacks adequate specificity to put a reasonable officer on notice that the Officers' actions *under these circumstances* violated the Fourteenth Amendment. *See Forrester v. Stanley*, 394 Fed. Appx. 673, 675 (11th Cir. 2010) ("*DeShaney* by no means establishes that it would be clear to a reasonable officer in [the defendant officer's] position that he had an affirmative duty of care to [the plaintiff] or that his conduct violated that duty in contravention of the Fourteenth Amendment.").

Indeed, the Supreme Court has recently reaffirmed that "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *Pauly*, 137 S. Ct. at 552 (citing *Creighton*, 483 U.S. at 640); *cf. Lewis*, 523 U.S. at 850-51 (opining that the "[r]ules of due process are not . . . subject to mechanical application in unfamiliar territory" and stating that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.").

And, particularizing this law to the facts of this case, the legal question of whether the Officers' acts "shock the conscience" turns on whether Mr. King voluntarily consented to lure in Mr. Brown. Because a reasonable officer would not have known that the Officers' remarks deprived Mr. King of any meaningful choice about whether to act as bait, the court must conclude that the Fourteenth Amendment substantive due process violation alleged by Mr. King in this case was not clearly established.

The Officers, therefore, are entitled to qualified immunity. The court will GRANT the Officers' motion for summary judgment as to Mr. King's Fourteenth Amendment Substantive Due Process Claim.

II.  State-Law Claims: Negligence, Wantonness, and False Imprisonment (Counts 4, 5, and 7)

In addition to his § 1983 and Fourteenth Amendment substantive due process claim, Mr. King argues that the Officers acted negligently and wantonly in planning the sting operation and that they falsely imprisoned him. The Officers assert that Alabama law entitles them to state-agent immunity on these state-law claims.

In Alabama, "state-agent immunity" generally shields a police officer "from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338(a). The officer claiming state-agent immunity must first demonstrate that his actions arose from a function that would entitle him to state-agent immunity, *i.e.*, that his "discretionary function" actions fell "within the line and scope of his or her law enforcement duties." *Ex parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008). If the officer makes that showing, the burden shifts to the plaintiff to show that an exception to state-agent immunity applies. *Id.*

The Officers have shown that their actions arose from their discretionary functions as

police officers.  Mr. King does not dispute that the Officers detained him and planned the sting operation as part of their duties as police officers—only that the Officers wrongfully coerced him into participating in the sting operation.  Because the allegedly wrongful acts arose from the Officers' discretionary effort to  enforce Alabama's criminal laws, the burden shifts to Mr. King to identify an exception to state-agent immunity.  *See Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) ("[E]xercising judgment in the enforcement of the criminal laws of the State" constitutes a discretionary function from which state-agent immunity arises).

The Alabama Supreme Court has identified two exceptions to Alabama state-agent immunity: first, "when the Constitution or laws of the United States, or the Constitution of [Alabama], or laws, rules, or regulations of [Alabama] enacted or promulgated for the purpose of regulating the activities of a governmental agency *require otherwise*; or [second] when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."  *Cranman*, 792 So. 2d at 405 (emphasis added).

Mr. King offers an argument for each exception.  Under the first exception, Mr. King contends that the Officers violated both the U.S. Constitution and Alabama's harassment statute, such that those laws "require otherwise."  But Mr. King misreads the first exception to state-agent immunity, incorrectly substituting the term "violates" for the actual text—"require[s] otherwise."  *See id.*  The question is whether the Constitution or any other law requires *the stripping of immunity* in these circumstances, not whether the Officers might be liable under any particular constitutional provision or statute.  *See id.*  Reading the exception using Mr. King's construction of the language would, in effect, eviscerate this immunity from suit because an immunity that evaporates upon *any* plausible claim or evidence of liability provides no meaningful protection from suit.  *See Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003)

(describing state-agent immunity as an "immunity from suit").

And, here, neither the U.S. Constitution nor Alabama's harassment statute require the stripping of immunity. The Constitution does not require the stripping of immunity for state-law offenses based on the existence of a constitutional violation; indeed, its text does not address the issue at all. Likewise, Alabama's harassment statute says nothing about whether violating it strips a police officer of state-agent immunity. *See* Ala. Code § 13A-11-8(2).

Next, Mr. King contends that the Officers acted beyond their authority, so as to invoke the second *Cranman* exception. Specifically, Mr. King points to the City of Warrior police department regulations that prohibit physical coercion of suspects and dictate that officers "shall not use duress or coercion nor mistreat an accused person in any way when endeavoring to obtain investigative information." (Doc. 81 at 29).

True, a state-agent acts beyond his authority and loses immunity if, in the pursuit of his duties, he fails to follow "detailed rules or regulations." *Giambrone*, 874 So. 2d at 1052 (quoting *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000)). But the failure to follow a rule or regulation erases a state agent's immunity only if the rule provided "specific instructions" to the state agent or was otherwise "checklist-like." *Giambrone*, 874 So. 2d at 1052. The rule or regulation must "remove a [s]tate agent's judgment in the performance of required acts;" "general statements" or standards do not suffice to invoke *Cranman*'s second exception to state-agent immunity. *Id.* In other words, to invoke the second *Cranman* exception, a rule or regulation must be so specific that it removes the state agent's discretion and puts him on notice that certain, specific acts are unacceptable. *See Ex parte Ingram*, 229 So. 3d 220, 230-31 (Ala. 2017) (noting similarities in analysis of beyond-authority exception for state-agent immunity and of "clearly established" constitutional violation for qualified immunity); *see, e.g.*, *Giambrone*, 874 So. 2d at 1054

(vitiating state-agent immunity for high-school wrestling coach when he violated specific regulation prohibiting use of a certain wrestling technique on students).

As the Officers observe, the regulations to which Mr. King points are not the kind of detailed, discretion-stripping regulations contemplated by the Alabama Supreme Court. *See Giambrone*, 874 So. 2d at 1052. Rather, the regulations identified by Mr. King are broad regulations that allow significant discretion to the acting officer to determine what acts constitute "duress" or "coercion." These rules or regulations do not suffice to erase a police officer's state-agent immunity. *See Howard v. City of Atmore*, 887 So. 2d 201, 207 (Ala. 2003) (concluding that correction officer's potential violation of a regulation that required him to intermittently check on incarcerated "drug addicts" did not "strip him of his cloak of [s]tate-agent immunity" because the regulation left to the officer's discretion and judgment the determination of which inmates were drug addicts). Mr. King has thus failed to identify an applicable exception to state-agent immunity.

For those reasons, the Officers are entitled to state-agent immunity as to Mr. King's negligence, wantonness, and false imprisonment claims. The court will GRANT summary judgment in the Officers' favor as to those state-law claims.

## CONCLUSION

The court will GRANT the Officers' motions for summary judgment in all respects. The Officers are entitled to qualified immunity as to Mr. King's § 1983 claim and state-agent immunity as to Mr. King's negligence, wantonness, and false imprisonment claims. The court will ENTER SUMMARY JUDGMENT in the Officers' favor on these claims by separate order.

**DONE** and **ORDERED** this 6th day of September, 2018.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE